# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-17-00740-CV

**Dr. Paul Richter, Appellant**

**v.**

**Steven K. Downey, Appellee**

### FROM THE DISTRICT COURT OF COMAL COUNTY, 207TH JUDICIAL DISTRICT
### NO. C2016-1261B, HONORABLE TODD A. BLOMERTH, JUDGE PRESIDING

## O P I N I O N

Dr. Paul Richter, D.O., appeals an order denying his motion to dismiss a health care liability claim under the Texas Medical Liability Act (TMLA), Tex. Civ. Prac. & Rem. Code §§ 74.001–.507, and overruling his objection to the expert report filed in support of the claim, *see id.* § 74.351 (requiring expert report and providing for dismissal where court finds report untimely or inadequate). Because we conclude that the district court acted within its discretion in overruling Richter's objection and denying his motion, we affirm.

## BACKGROUND[1]

On October 27, 2014, Steven Downey felt stomach pain and visited the Emergency Department (ED) at Christus Santa Rosa Hospital in New Braunfels. Later that afternoon, Richter

---

[1] The expert report at issue provides the background facts, and we accept the factual statements therein for the limited purpose of this appeal. *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 53 (Tex. 2002).

examined Downey and observed that his lower-right abdomen was tender to the touch. Richter discharged Downey without performing any diagnostic testing. He instructed Downey to return if his symptoms worsened and noted in his file, "appendicitis precautions given. Return to ED for any worsening of symptoms."

Four days later, Downey returned to the ED and was diagnosed with acute appendicitis with perforation and peritonitis. That same day, Downey underwent an operation for appendicitis which revealed an intra-abdominal abscess and bowel damage requiring removal of a portion of the bowel. Over the next several months, Downey developed additional abscesses requiring drainage, underwent two laparotomies, underwent an ileostomy and reversal, developed a leak in his bowel requiring repair, experienced renal failure, developed an enterocutaneous fistula, was placed on intravenous feeding three times and a catheter once, and was hospitalized four times.

Downey alleges that Richter was negligent and breached his duty of care by failing to test for, diagnose, and treat acute appendicitis on October 27, and that the delay in diagnosis caused Downey's appendix to perforate, resulting in the complications described above. To comply with the TMLA's expert-report requirement, Downey served Richter with an expert report from Dr. Andrew Butler, M.D. (Original Report). *See id.* § 74.351(a) (requiring service of expert report to maintain health care liability claim). Richter objected to the report as inadequate under the TMLA with respect to standard of care and causation. *See id.* § 74.351(r)(6) (defining "expert report" as summarizing standard of care, provider's departure from that standard, and how departure caused injury). After a hearing, the district court ruled that the Original Report was inadequate and gave Downey thirty days to submit an amended report. *See id.* § 74.351(c) (allowing one 30-day

2

extension if expert report is found deficient). Downey timely served Richter with Butler's amended

report (Amended Report).

The Amended Report asserts that Richter breached the standard of care by:

1.      Failing to obtain a CT scan of the abdomen and pelvis in a patient presenting with right lower quadrant abdominal pain and tenderness.[2]

2.      Failing to obtain laboratory testing in a patient presenting with lower right quadrant abdominal pain and tenderness.

3.      Failing to recognize that Mr. Downey had acute appendicitis.

4.      Failing to appropriately treat Mr. Downey's acute appendicitis.

5.      Failing to consult a surgeon for Mr. Downey's acute appendicitis.

6.      Failing to initiate antibiotics for Mr. Downey's acute appendicitis.

7.      Failing to give Mr. Downey appropriate precautions regarding the possibility of acute appendicitis on discharge.

The Amended Report continues by noting that Downey's presentation was "consistent with acute

appendicitis." Butler bases this opinion on his experience that the presentation of right-lower

quadrant pain and tenderness on physical examination "is typical of the symptoms caused by acute

appendicitis." Further, the Amended Report cites the American College of Emergency Physicians

Clinical Policy on Appendicitis and the Journal of the American Medical Association in support of

---

[2] The Amended Report further explains that when patients present with right lower quadrant abdominal pain and tenderness, "the Emergency Department standard of care is to obtain a CT scan of the abdomen and pelvis to rule out acute appendicitis." According to the Amended Report, three sources— Rosen's Emergency Medicine textbook, Tintanelli's Emergency Medicine textbook, and a recent study from the Annals of Internal Medicine—support this approach. The Annals of Internal Medicine study involved 3000 patients with suspected appendicitis over a nine-year period and concluded by recommending "routine use of [CT scan] as the standard of care for suspected appendicitis in adults."

3

Butler's opinion that the presence of right lower quadrant abdominal pain "is the most useful clinical finding for identifying patients at increased likelihood for appendicitis."

The Amended Report acknowledges that "some cases of early appendicitis will not be evident on CT scan." It further states that "where a patient presents with right lower quadrant abdominal pain and tenderness and a normal CT scan," the standard of care is to give the patient careful discharge instructions regarding the possibility of a missed early appendicitis. Downey's written discharge instructions note "appendicitis precautions given. Return to ED for any worsening of symptoms," but the remainder of the instructions concern musculoskeletal pain. According to Dr. Butler, "There are no specific instructions telling Mr. Downey to return for persistent symptoms, or to be evaluated within a specific time course, or telling Mr. Downey what symptoms he should seek medical evaluation for." The Amended Report claims that emergency physicians typically "recommend that a patient be reevaluated within 24 hours, and return within this time if symptoms persist or worsen or if fevers or vomiting develop."

With regard to causation, the Amended Report opines

> had Dr. Richter performed a CT scan on Steven Downey on [October 27, 2014], the diagnosis of acute appendicitis would have been made and Mr. Downey would have undergone an uncomplicated appendectomy, and the complications, procedures, operations and hospitalizations that Mr. Downey later experienced related to his perforated appendicitis would have been avoided. In short, it is my opinion that Dr. Richter's failure to perform a CT scan on Steven Downey on [October 24, 2014] was a direct and proximate cause of damages sustained by Mr. Downey as a result of his perforated appendix.

In support of this causation opinion, the Amended Report notes that "the risk for perforation in acute appendicitis increases with time" and that "a delay in diagnosis and treatment of appendicitis is associated with an increased risk of perforation." It cites a study published in

4

the Annals of Surgery, which "showed that 65% of patients with perforated appendicitis had experienced symptoms for longer than 48 hours." It further references the medical website UptoDate.com, which states that "wound infections and intra-abdominal abscesses occur typically in patients with perforated appendicitis and are 'very rare' in patients with simple appendicitis undergoing an uncomplicated appendectomy." Finally, it points to a U.S. Department of Health and Human Services report indicating that "appendiceal perforation increases the risk of wound infection, abscess formation, sepsis, wound dehiscence, pneumonia, prolonged ileus, heart failure, and renal insufficiency."

Richter objected that the Amended Report was inadequate with respect to causation[3] and moved for dismissal under the TMLA. *See id.* § 74.351(b) (providing for dismissal where expert report is untimely or inadequate), (l) (providing that expert report is inadequate if it does not represent a good-faith effort to comply with subsection (r)(6)'s definition of "expert report"). On October 17, 2017, the district court overruled Richter's objection to the Amended Report and denied his motion to dismiss. Richter timely filed a notice of appeal. *See id.* § 51.014(a)(9) (providing interlocutory review of district court's order denying relief sought under § 74.351(b)).[4]

---

[3] Richter did not object to the Amended Report's adequacy regarding the standard of care.

[4] Richter subsequently filed a "Motion for Reconsideration/Rehearing of [his] Objections to Plaintiff's First Amended Expert Report and Motion to Dismiss," which the district court denied. Richter filed a notice of interlocutory appeal from that denial, docketed under this cause number. We do not address the district court's denial of Richter's "Motion for Reconsideration/Rehearing" because we conclude that the court acted within its discretion in denying the underlying motion to dismiss. *See* Tex. R. App. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal."). Moreover, we find no support for an independent right to an interlocutory appeal of such an order. *See Central Tex. Spine Inst., LLP v. Brinkley*, 344 S.W.3d 537, 542 (Tex. App.—Austin 2011, pet. denied) (concluding that order denying motion to reconsider denial of motion to dismiss

5

## LEGAL STANDARD

The TMLA requires "a claimant to serve an expert report early in the proceedings on each party against whom a health care liability claim is asserted." *Baty v. Futrell*, 543 S.W.3d 689, 692 (Tex. 2018) (citing Tex. Civ. Prac. & Rem. Code § 74.351(a)). "[T]he purpose of the expert report requirement is to weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims." *Abshire v. Christus Health Se. Tex.*, No. 17-0386, 2018 WL 6005220, at *3 (Tex. Nov. 16, 2018) (per curiam) (citing *American Transitional Care Ctrs. of Tex. v. Palacios*, 46 S.W.3d 873, 877 (Tex. 2001) (noting that "eliciting an expert's opinions early in the litigation [is] an obvious place to start in attempting to reduce frivolous lawsuits")). The statute provides for dismissal of claims on a health care provider's motion if the required expert report is not timely served. *See* Tex. Civ. Prac. & Rem. Code § 74.351(b). Importantly, "an expert report has not been served within the period specified by Subsection (a) [when] elements of the report are found deficient." *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 459 (Tex. 2017) (quoting *Lewis v. Funderburk*, 253 S.W.3d 204, 207 (Tex. 2008) (alteration in *Zamarripa*)). In other words, both untimely expert reports and timely but deficient expert reports provide a basis for dismissal of health care liability claims. *See, e.g.*, *Lewis*, 253 S.W.3d at 207–08 (noting that TMLA "defines a timely but deficient report as one that 'has not been served'") (quoting Tex. Civ. Prac. & Rem. Code § 74.351(c)).

When a litigant objects under the TMLA, the district court "shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the

was not appealable under Tex. Civ. Prac. & Rem. Code § 51.014(a)(9)).

6

report does not represent an objective good faith effort to comply with the [TMLA's] definition of an expert report." Tex. Civ. Prac. & Rem. Code § 74.351(l). Under that definition:

> "Expert report" means a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6).

The Supreme Court of Texas has held that an expert report represents a good-faith effort to comply with this definition if it satisfies the two-part *Palacios* test, which requires "(1) informing the defendant of the specific conduct called into question and (2) providing a basis for the trial court to conclude the claims have merit." *Baty*, 543 S.W.3d at 693–94 (citing *Palacios*, 46 S.W.3d at 877). It has also described "a 'good faith effort' in this context" as "a report that does not contain a material deficiency. Therefore, an expert report that includes all the required elements[,] and that explains their connection to the defendant's conduct in a non-conclusory fashion[,] is a good faith effort." *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 513 (Tex. 2017) (per curiam) (alterations original) (quoting *Samlowski v. Wooten*, 332 S.W.3d 404, 409–10 (Tex. 2011)).

In assessing adequacy, courts are limited to the four corners of the report. *E.g.*, *Palacios*, 46 S.W.3d at 878 ("Because the statute focuses on what the report discusses, the only information relevant to the inquiry is within the four corners of the document."). Nevertheless, form does not trump substance: "[C]ourts must view the report in its entirety, rather than isolating specific portions or sections, to determine whether it includes" the required information. *Baty*, 543 S.W.3d

7

at 694 (citing *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 144 (Tex. 2015); *Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 282 (Tex. App.—Austin 2007, no pet.) ("The form of the report and the location of the information in the report are not dispositive.")). The four-corners requirement nevertheless "precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended." *Austin Heart*, 228 S.W.3d at 279.

A report is adequate with respect to causation if it explains, "based on facts set out in the report, how and why a health care provider's breach of the standard of care caused the injury." *Zamarripa*, 526 S.W.3d at 459–60 (citation and punctuation marks omitted). "A bare expert opinion that the breach caused the injury will not suffice." *Id.* at 460. "'[R]ather, the expert must explain the basis of his statements to link his conclusions to the facts.'" *Id.* (quoting *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)). "In showing how and why a breach of the standard of care caused injury, the expert report must be a good-faith effort to explain, factually, how proximate cause is going to be proven." *Id.* Proximate cause has two elements: foreseeability and cause in fact. *Id.* (citing *Rodriguez-Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex. 2013) (per curiam)).

We review denial of a motion to dismiss under Section 74.351 for abuse of discretion. *See, e.g.*, *TTHR Ltd. P'ship v. Moreno*, 401 S.W.3d 41, 44 (Tex. 2013). "Under that standard, appellate courts defer to the trial court's factual determinations if they are supported by evidence, but review its legal determinations de novo." *Van Ness*, 461 S.W.3d at 142. "In the absence of findings of fact or conclusions of law, a trial court's judgment will be upheld on any theory supported by the record, and any necessary findings of fact will be implied." *Rosemond v. Al-Lahiq*, 331 S.W.3d 764, 766 (Tex. 2011).

## DISCUSSION

Richter argues that the Amended Report is inadequate with respect to causation because it fails to address cause in fact and foreseeability. Downey responds that the report, viewed in its entirety, adequately addresses causation by identifying facts in Downey's medical record and medical studies which support the conclusion that Richter's failure to perform a CT scan on October 27, 2014, "was a direct and proximate cause of damages sustained by Mr. Downey as a result of his perforated appendix." Downey points to the report's statements that Downey exhibited appendicitis symptoms on his October 27 ED visit, that the standard of care for those symptoms is to perform a CT scan, and that Richter discharged Downey without performing a CT scan. Downey also highlights the report's recitations that a delay in diagnosis increases the risk of appendiceal perforation; that most patients with perforated appendicitis experience symptoms for longer than 48 hours; that infections and abscesses are very rare in patients with uncomplicated appendicitis; and that perforation in appendicitis increases the risk of infection, abscesses, prolonged ileus, and renal insufficiency—most of which Downey suffered. In reply, Richter contends that the report does not establish proximate cause because it fails to describe what a CT scan conducted on October 27 would have shown and argues that the report does not address causation for any alleged breach of the standard of care other than the failure to perform a CT scan.

The first prong of *Palacios* requires us to determine whether the Amended Report represents a good-faith effort to inform Richter "of the specific conduct called into question." *Baty*, 543 S.W.3d at 693 (citation omitted). We "view the report in its entirety, rather than isolating specific portions or sections, to determine whether it includes" the required information. *Id.* at 694.

9

The Amended Report specifies that "[i]n patients presenting with right lower quadrant abdominal pain and tenderness, the Emergency Department standard of care is to obtain a CT scan of the abdomen and pelvis to rule out acute appendicitis." It then cites medical literature to support this assertion and concludes, "It is my opinion that Dr. Richter violated the standard of care by failing to perform a CT scan on Steven Downey on [October 27, 2014]."

The Amended Report alludes to other breaches but does not opine that any of Richter's conduct other than the failure to perform a CT scan violated the standard of care with respect to Downey. It lists additional alleged breaches, but never mentions them in the remainder of the report, save one: "Failing to give Mr. Downey appropriate precautions regarding the possibility of acute appendicitis on discharge." The report states that "where a patient presents with right lower quadrant abdominal pain and tenderness and a normal CT scan, most emergency physicians . . . will recommend that a patient be reevaluated within 24 hours, and return within this time if symptoms persist or worsen of if fevers or vomiting develop." Crucially, however, the report does not specify that this is the standard of care. And even if it did, it is untethered to the facts: since Richter did not order a CT scan, he did not confront a situation where "a patient presents with right lower quadrant abdominal pain and tenderness *and a normal CT scan*." (Emphasis added.) Thus, the report satisfies the first element of *Palacios*, but only insofar as it states that failure to perform a CT scan on October 27, 2014 is the breach called into question. "A report that satisfies [the TMLA's required elements], even if as to one theory only, entitles the claimant to proceed with a suit against the physician or health care provider." *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013). Accordingly, we proceed to the second prong of the *Palacios* test.

In assessing the second prong—whether the Amended Report provides a basis to conclude that Downey's claims have merit—we consider whether the report explains how foreseeability and cause in fact will be proven. *See Zamarripa*, 526 S.W.3d at 459–60. "The report need not use the words 'proximate cause,' 'foreseeability,' or 'cause in fact'" to be adequate; indeed, "merely incanting words does not suffice." *Id.* at 460 (citing *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 53 (Tex. 2002); *Earle*, 998 S.W.2d at 890). The report must, however, provide a factual explanation of how the expert intends to prove that the breach proximately caused the injury. *Id*. In evaluating the Amended Report, we are mindful of the Texas Supreme Court's most recent decision involving the adequacy of a TMLA-required expert report, *Abshire*, 2018 WL 6005220. There, the Court emphasized that our inquiry is limited to "whether the expert has explained how the negligent conduct caused the injury," and that "[t]he ultimate evidentiary value of the [expert] opinions [] is a matter to be determined at summary judgment and beyond." *Id.* at *6.

## A.     Foreseeability

"A physician's or health care provider's breach is a foreseeable cause of the plaintiff's injury if a physician or health care provider of ordinary intelligence would have anticipated the danger caused by the negligent act or omission." *Curnel v. Houston Methodist Hosp.-Willowbrook*, No. 01-17-00088-CV, 2018 WL 3883402, at *5 (Tex. App.—Houston [1st Dist.] Aug. 16, 2018, no pet.) (mem. op.) (citing *Price v. Divita*, 224 S.W.3d 331, 336 (Tex. App.—Houston [1st Dist.] 2006, pet. denied)). The most recent Texas Supreme Court decision addressing foreseeability under the TMLA, *Miller v. JSC Lake Highlands Operations*, involved a patient who aspirated on a dislodged dental bridge. 536 S.W.3d at 512. The expert report represented a good-faith effort to show

11

foreseeability, as it "ma[de] clear that failing to identify the lodged dental bridge and alert appropriate personnel could result in harm." *Id.* at 515.[5]

Richter argues that the Amended Report does not address foreseeability. We disagree. An expert "report need not use the words 'proximate cause,' 'foreseeability,' or 'cause in fact'" and its "adequacy does not depend on whether the expert uses any particular 'magical words.'" *Zamarripa*, 526 S.W.3d at 460 (citing *Bowie*, 79 S.W.3d at 53). The Amended Report states plainly that on his October 27 ED visit "Downey's presentation was consistent with acute appendicitis" and that "[i]n patients presenting with right lower quadrant abdominal pain and tenderness, the Emergency Department standard of care is to obtain a CT scan of the abdomen and pelvis to rule out acute appendicitis." In fact, the report states that "right lower quadrant abdominal pain is *the most useful clinical finding* for identifying patients at increased likelihood for appendicitis." (Emphasis added.) It further asserts that "The risk for perforation in acute appendicitis increases with time; a delay in diagnosis and treatment of appendicitis is associated with an increased risk of perforation." And the report identifies medical literature correlating perforated appendicitis with increased risk of wound infection, abscess formation, prolonged ileus, and renal insufficiency.

Citing this literature in support, the Amended Report explains that a delay in diagnosis and treatment of appendicitis is associated with an increased risk of perforation; that "65% of patients with perforated appendicitis had experienced symptoms for longer than 48 hours"; that "wound infections and intra-abdominal abscesses occur typically in patients with perforated

---

[5] The report was adequate as to cause in fact because it explained that such a delay caused a series of pulmonary issues that caused the patient's aspiration and death. *See Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 517 (Tex. 2017) (per curiam).

12

appendicitis and are 'very rare' in patients with simple appendicitis undergoing an uncomplicated appendectomy"; and that "appendiceal perforation increases the risk of wound infection, abscess formation, sepsis, wound dehiscence, pneumonia, prolonged ileus, heart failure, and renal insufficiency." Based upon the foregoing, the district court reasonably could have concluded that the report represents a good-faith effort to demonstrate that an ED physician of ordinary intelligence would have anticipated that there was danger associated with failing to perform a CT scan on a patient with Downey's symptoms.

## B.    Cause in fact

"For a negligent act or omission to have been a cause-in-fact of" injury, "the act or omission must have been a substantial factor in bringing about the harm, and absent the act or omission—*i.e.*, but for the act or omission—the harm would not have occurred." *Zamarripa*, 526 S.W.3d at 460 (quoting *Rodriguez-Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex. 2013) (per curiam)). Cause in fact—along with foreseeability—"is the causal relationship between breach and injury that an expert report must explain to satisfy the Act." *Id.*

Three recent Texas Supreme Court cases considering motions to dismiss under the TMLA inform our analysis. In *Van Ness*, the Court considered the adequacy of an expert report with conflicting statements about pertussis (colloquially, whooping cough) after two-month-old Nicholas Van Ness died from the disease. *See* 461 S.W.3d at 142–43. The expert report stated that "the applicable standard of care" for a patient with Nicholas's symptoms was to "perform laboratory tests, administer antibiotics prophylactically while the tests are pending and/or to admit the infant to a medical facility," but that the physician had not done so. *Id.* at 142. The report opined that, had the

13

physician "performed any of these tests, it would have shown [pertussis] at a treatable stage and but for the failure to treat Nicholas Van Ness as outlined above he would have had a 51% or more chance of survival." *Id.* The Court considered the healthcare provider's objection that elsewhere in the report the expert indicated "treatment [for pertussis] is of little benefit to the person infected," but "antibiotics may shorten the duration of infectiousness and are thus recommended." *Id.* at 143–44. Thus, the provider argued, the report did not establish that failure to provide antibiotics caused Nicholas's death. The Court rejected this argument because considering the *entire* report—including potentially conflicting statements—"the trial court did not abuse its discretion by determining that the report was not conclusory, but was a good faith effort to comply with the [Act]'s requirements." *Id.* at 144.

Two years later, in *Zamarripa*, the Court made clear that a report must speak to both foreseeability and cause in fact to adequately address causation. 526 S.W.3d at 460 (abrogating lower court holdings that expert reports need not address proximate cause to satisfy TMLA's causation requirement). In *Zamarripa*, Yolanda Iris Flores died from complications of childbirth while she was being transferred, during labor, from Valley Regional to another hospital on order of Dr. Patrick Ellis. *Id.* at 456–57. Valley Regional challenged the adequacy of an expert report opining that by "'permitting and facilitating the transfer,' Valley Regional caused Flores to be in an ambulance when she suffered a placental abruption and cardiac arrest, leading to her death." *Id.* at 461. The Court found this insufficient to show that Valley Regional proximately caused Flores's death because it does not "explain[] how Valley Regional had either the right or the means to

14

persuade Dr. Ellis not to order the transfer or to stop it when he did." *Id.* It therefore failed to show proximate cause.

Most recently, in *Abshire*, the Supreme Court cautioned that "the court's role" in considering a motion to dismiss under the TMLA "is to determine whether the expert has explained how the negligent conduct caused the injury," and that "[w]hether this explanation is believable should be litigated at a later stage of the proceedings." *Abshire*, 2018 WL 6005220, at *6. *Abshire* considered an expert report's adequacy to establish that a hospital's nursing staff caused paraplegia and incontinence when, over six hospital visits, the spinal fracture that led Abshire to develop those injuries was not diagnosed. On two of her six visits, nursing staff failed to note on Abshire's chart that she suffered from brittle bone disease (OI), which rendered her more vulnerable to fractures and altered the standard of care. *Id.* at *1–2. The expert report stated that "had [Christus] followed the Standard of Care for patients with OI, Ms. Abshire in medical probability would not have developed paraplegia and bowel and bladder incontinence." *Id.* at *2 (alteration original). The district court denied the hospital's motion to dismiss under the TMLA. *Id.* The court of appeals reversed, holding that the report "did not show how the nurses' failure to document Abshire's OI caused her paraplegia." *Id.* at *3. The Supreme Court disagreed, concluding that the "report draws a line directly from the nurses' failure to properly document Abshire's OI and back pain, to a delay in diagnosis and proper treatment (imaging of her back and spinal fusion), to the ultimate injury (paraplegia)." *Id.* at *5. It emphasized that "with respect to causation, the court's role is to determine whether the expert has explained how the negligent conduct caused the injury. Whether this explanation is believable should be litigated at a later stage of the proceedings." *Id.* at *6.

15

The district court reasonably could have concluded that the Amended Report represents a good-faith effort to "explain, factually, how proximate cause is going to be proven." *See Zamarripa*, 526 S.W.3d at 460. It explains that Downey exhibited textbook appendicitis symptoms on October 27, that the standard of care called for a CT scan, and that Richter discharged Downey without performing a CT scan. It offers the opinion, within a reasonable degree of medical certainty, that "had Dr. Richter performed a CT scan [] on [October 27], the diagnosis of acute appendicitis would have been made and Mr. Downey would have undergone an uncomplicated appendectomy." It then connects delayed diagnosis and treatment of acute appendicitis to appendiceal perforation, and explains that injuries Downey suffered are more likely to occur in patients with perforated appendicitis (as opposed to those with uncomplicated appendicitis).

Our sister courts have reached similar results in cases seeking recovery for complications associated with an alleged missed diagnosis of appendicitis. For example, in *United Regional Health Care System v. Hardy*, the Second Court of Appeals considered a patient who presented in the emergency room with extreme pain in the lower right quadrant of his abdomen. No. 02-11-00395-CV, 2012 WL 1624153, at *1 (Tex. App.—Fort Worth May 10, 2012, no pet.) (mem. op.). The treating physician ordered a plain (non-contrast) X-ray of Hardy's abdomen, diagnosed him with a UTI, and discharged him home. *Id.* Six days later, Hardy was diagnosed with a ruptured appendix that had spread through his abdominal cavity and had eroded part of his colon, requiring removal. *Id.* The expert report stated that, based on the patient Hardy's "textbook" symptoms of appendicitis during his initial ED visit, "Hardy would have been or should have been diagnosed with appendicitis and an appendectomy would have been or should have been ordered.

16

Because this was not done, Hardy's appendicitis was not diagnosed and was allowed to fester and develop into an abscess, resulting in Hardy's injuries." *Id.* at \*3. The court of appeals held that the report "represents a good-faith effort to state the causal relationship between the alleged breaches of the standard of care and Hardy's injuries and is therefore sufficient as to causation." *Id.* (citation omitted).

The Ninth Court of Appeals reached a similar result in *CHCA Mainland, L.P. v. Wheeler*, where hospital staff failed to appropriately triage a patient with appendicitis symptoms to ensure that she was seen by a physician. No. 09-07-00634 CV, 2008 WL 960798, at \*5 (Tex. App.—Beaumont Apr. 10, 2008, no pet.) (mem. op.). The expert report concluded that the patient should have been triaged as urgent or emergent based on her symptoms, and that because the hospital staff failed to do so, the patient's appendix ruptured before she was seen by a physician. *Id.* at \*1–2. The court of appeals concluded that the expert report provided a basis to conclude the claims had merit where it stated that—if not for the hospital's breach of the standard of care by failing to have the patient's appendicitis symptoms evaluated by qualified medical personnel—the patient "would have been spared the generalized intraperitoneal sepsis that necessitated more extensive surgery and an extended hospitalization." *Id.* at \*5.

Particularly in light of the *Abshire* Court's admonition that we avoid addressing the believability of expert reports at this stage, we find these other appendicitis cases persuasive. In *Abshire*, as here, a plaintiff alleges that a missed diagnosis delayed treatment, resulting in injuries that were more serious than they would have been had the standard of care been followed. And in reviewing a causation challenge to the expert report in that case, the Court held that it is not proper

17

for a court at this stage in litigation to assess whether the causation analysis is "believable" in the sense that it is supported by a robust and unimpeachable evidentiary record. Instead, "[t]he ultimate evidentiary value of the [expert] opinions [] is a matter to be determined at summary judgment and beyond." *Abshire*, 2018 WL 6005220, at *6; *see also, e.g.*, *Zamarripa*, 526 S.W.3d at 460 ("While the plaintiff is not required to prove her claim with the expert report, the report must show that a qualified expert is of the opinion she can."); *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010) (explaining that expert report need not "marshal all the plaintiff's proof").

We are not convinced otherwise by Richter's argument that the report's acknowledgment that "[s]ome cases of early appendicitis will not be evident on CT scan" renders it insufficient on causation. The Texas Supreme Court rejected a similar argument in *Van Ness*, where it concluded that an expert report with potentially inconsistent statements is not necessarily fatal to a plaintiff's TMLA claim. Rather, "the trial court ha[s] discretion—indeed it [is] incumbent on the trial court—to review the report, sort out its contents, resolve any inconsistencies in it, and decide whether the report demonstrated a good faith effort to show that the [] claims had merit." *Van Ness*, 461 S.W.3d at 144. Similarly here, the district court had discretion to resolve any inconsistencies in the Amended Report in assessing its adequacy. The report's indications that Downey had begun experiencing symptoms that morning and that most patients experience symptoms for more than 48 hours before their appendix perforates provides a basis to conclude that the failure to perform a CT scan was a cause in fact of his later injuries.

Finally, both parties cite our sister court's decision in *Adeyemi v. Guerrero*, which underscores the result we reach here. 329 S.W.3d 241, 246 (Tex. App.—Dallas 2010, no pet.). In

18

*Adeyemi*, Guerrero struck her head on a bathroom floor while in active labor. Over the next few days, she exhibited unexplained vomiting and repeatedly complained of headaches. On her third day in the hospital, Guerrero suffered a seizure and was diagnosed with a significant hematoma requiring brain surgery. Guerrero alleged that Adeyemi was negligent in failing to order a CT scan to investigate the fall and headaches. Adeyemi challenged causation, arguing that Guerrero's expert report did not show "how the performance of a CT scan or neurological consultation would have prevented Guerrero's injuries." *Id.* The Dallas Court of Appeals rejected this argument, concluding that "the report clearly states that, based on reasonable medical probability, a CT scan would have detected Guerrero's initial hemorrhage and, if identified early, such hematomas are easily remediable." *Id.* Similarly here, Dr. Butler offers his opinion that, had a CT scan been performed on October 27, "the diagnosis of acute appendicitis would have been made and Mr. Downey would have undergone an uncomplicated appendectomy, and the complications, procedures, operations and hospitalizations that Mr. Downey later experienced related to his perforated appendicitis would have been avoided." It then cites a study, a medical website, and a report from a federal agency to support this conclusion.

In summary, the Amended Report "links conclusions to specific facts," tracing the decision to discharge Downey without performing diagnostic testing to the ensuing delay that occasioned Downey's injuries. *See Abshire*, 2018 WL 6005220, at *4 (explaining that expert report must "link conclusions to specific facts" to satisfy causation requirement). Putting aside, as we must, whether Downey will be able to prove causation, a district court could have reasonably concluded that his claims could have merit based on the facts set out in the Amended Report. *See,*

19

*e.g.*, *Palacios*, 46 S.W.3d at 879 (explaining that "to avoid dismissal, a plaintiff need not present evidence in the report as if it were actually litigating the merits . . . the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial."). Accordingly, we overrule Richter's sole issue.

## CONCLUSION

Having overruled the sole issue on appeal, we affirm the district court's order.


_____
Michael Toth, Justice

Before Justices Puryear, Bourland, and Toth

Affirmed

Filed:   December 7, 2018

20