**Opinion issued July 2, 2024**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-24-00005-CV**

———————————

**RAOUF HANNA, DDS AND HANNA DENTAL IMPLANTS, LLLP,**
**Appellants**

**V.**

**THOMAS NEIL TURNER, Appellee**

———————————

**On Appeal from the 295th District Court**
**Harris County, Texas**
**Trial Court Case No. 2023-29015**

———————————

**MEMORANDUM OPINION**

This accelerated interlocutory appeal arises from a suit for dental malpractice. Thomas Neil Turner sued his dentist, Raouf Hanna, and Hanna's practice, Hanna Dental Implants, LLLP, alleging negligent placement of implants. As required by the Texas Medical Liability Act, Turner timely served an expert report, and later a

timely supplemental expert report, regarding the standard of care, its breach, and proximate cause. Hanna objected that the reports were inadequate in all three respects. The trial court ultimately overruled Hanna's objection. Hanna appeals.

We affirm.

## BACKGROUND

### *Turner's Petition*

In his live pleading, Turner alleges that Hanna assured him he was a good candidate for dental implants after performing a single, limited evaluation. A month later, Hanna extracted all of Turner's remaining teeth, 27 in total, and installed several implants. Within a month or so afterward, Turner reported that his lip sometimes tingled and some liquids ran out of his nose when he drank. Hanna reassured Turner that he was still in the process of healing from the procedure, but also indicated that he would evaluate the possibility that there was a problem.

According to Turner, he continued to complain about the liquids issue during subsequent office visits. Each time he was reassured that he was still healing, either by Hanna or one of Hanna's employees, and Turner relied on these reassurances.

Several years later, after continued problems that included constant sinus infections and severe headaches, Turner sought emergency treatment for respiratory problems, neck pain, and swollen lymph nodes. While being treated for these

conditions, Turner learned for the first time that dental screws implanted in his jaw by Hanna were protruding into his nasal passageway and his left maxillary sinus.

Turner then sued Hanna and Hanna's dental practice for negligence. Among other things, Turner alleges that Hanna did not perform proper diagnostic imaging before removal of his teeth and installation of implants or after the procedure; properly assess the bone depth of his jaw before or after the procedure; or recognize and correct complications that developed after the procedure and caused Turner's injuries, including nasal perforations, sinus perforations, and nerve damage.

Due to his injuries, Turner further alleges, all his dental implants must be removed. In addition, Turner has required extensive other medical treatments, and his treatments to repair the injuries caused by Hanna remain ongoing. At least one injury, certain nerve damage, is irreparable and cannot be undone by treatment.

*Expert Report*

With his petition, Turner served Hanna with an expert report made by Alan L. Rosenfeld, DDS. When Rosenfeld made his report, he had been a practicing dentist for almost fifty years. As his qualifications are not in dispute, we do not dwell on them in detail. Among other things, however, Rosenfeld is a certified specialist in periodontics, the branch of dentistry focused on the gums and jawbone, and he has placed thousands of dental implants during his career. For more than three decades,

Rosenfeld has used computed tomography scans—often referred to as CT or CAT scans—to aid him in the diagnosis and treatment planning of dental implants.

Rosenfeld summarizes the treatment Turner received from Hanna over the course of a little more than three years. When he first came into Hanna's care, Turner was in his early 60s. Turner's chief complaint concerned past dental work and his desire for a permanent solution to dental issues. Rosenfeld notes that Hanna initially performed a "limited evaluation" that did not include "an assessment of the integrity of existing dental restorations" and included a single panoramic x-ray. Though Hanna's treatment plan was "complex, aggressive, and not reversible," Rosenfeld observes that the entire initial visit was "completed in approximately one hour."

A month after the initial visit, Hanna removed all 27 of Turner's remaining teeth and installed nine implants: five in the upper jaw and four in the lower jaw.

At follow-up visits during the next month, Turner complained that his lower lip tingled sometimes and some liquids exited through his right nostril when he drank them. Rosenfeld notes that there was no record that Hanna assessed these complaints. Instead, Turner was told that he needed to heal, and that the possibility of communication between the mouth and nose would be addressed if necessary.

In the next several months, there were multiple follow-up visits. As documented in Turner's dental records, these visits primarily concerned the fabrication, construction, and installation of the final prostheses and their

maintenance. This was followed by a nine-month period in which Turner did not see Hanna. Rosenfeld states that this gap in treatment may be related to the Covid-19 pandemic but that Turner should have been seen by Hanna during this period.

At a later visit, a little under a year and half after the initial removal of Turner's teeth, Hanna removed the upper jaw prosthesis in order to adjust it to improve lip support. In the process, Hanna observed an oroantral fistula, which is an abnormal communication or connection between the mouth and the sinus in the upper jaw. Apparently, this issue was noted in Turner's records more than a year beforehand. Rosenfeld states that though entries "suggest this was addressed previously," "no assessment of maxillary sinus health was entered into the patient record."

About a month later, another dentist at Hanna's practice saw Turner for a complaint that he felt a clicking or movement while chewing. The dentist determined "that component looseness existed." It is unclear what treatment, if any, was given.

Almost five months afterward, Turner visited Hanna's practice for implant maintenance. Among other things, it was noted that he had acute mucositis, a condition involving pain and inflammation of the mucous membranes. In two later visits, six months and ten months after the initial one when acute mucositis was observed, it was again noted that Turner continued to suffer from this condition.

Just over three years after the initial procedure, Turner went to the emergency room of Memorial Hermann Hospital. His complaints included a month-long runny

5

nose, strep throat treated with two rounds of antibiotics, neck pain severe enough to preclude driving, severe headache the previous day, swollen lymph nodes, and shortness of breath. A CT scan was performed. Among other things, the scan showed that three dental screws protruded into the nasal passageway, one dental screw was embedded in the septum, and at least one dental screw protruded into the left sinus of the upper jaw. A second dental screw possibly protruded into this sinus as well.

It was recommended that Turner seek treatment from an ear-nose-throat specialist and infectious disease specialist. Turner did so. He also saw a periodontist, who recommended that Turner see an oral and maxillofacial surgeon for treatment. Turner did so, and the surgeon concluded that all the implants in Turner's upper jaw would have to be removed, nasal and sinus fistulas would need surgical repair, and the nerve injury was permanent and would not improve with implant removal.

The surgeon removed the upper jaw implants. When he removed one of them, the left posterior implant, there was pus (liquid produced in infected tissue). Upon removal of the other ones, the surgeon noted a foul odor from the nasal cavity.

Turner has continued to experience problems afterward and has required additional treatment for a reoccurring sinus infection and sinus inflammation.

Based on Turner's medical history, Rosenfeld concludes that Hanna violated the standard of care in several ways. Rosenfeld opines that the standard of care required Hanna to make a comprehensive evaluation of Turner's teeth before

6

deciding whether extraction and replacement with implants was warranted, including the use of full-mouth periapical x-rays (an x-ray that images the entire tooth and supporting bone) and three-dimensional imaging. Hanna did not do so.

Similarly, Rosenfeld states that the standard of care required Hanna to use three-dimensional imaging after the removal of Turner's teeth and placement of implants to assess potential complications from the procedure. Hanna did not do so.

Rosenfeld further opines that the standard of care required Hanna to vigilantly monitor Turner for nasal and sinus perforations after the placement of the implants in the upper jaw. But Hanna failed to recognize, assess, and correct these problems.

In addition, Rosenfeld states that the standard of care required Hanna to vigilantly monitor Turner for nerve injuries after the placement of the implants in the lower jaw. Unless promptly identified and corrected, these injuries can become permanent. Hanna failed to verify the correct placement of the lower jaw implants and failed to recognize Turner's nerve injury and take corrective measures, including the immediate referral to a doctor specializing in the treatment of nerve injuries.

Rosenfeld also faults Hanna for failing to alter the prosthetic treatment plan in the face of inadequate implant support and biomechanical prosthetic failures, develop a prosthetic design that would allow for personal and professional hygiene maintenance, and create an adequate process for disclosure and informed consent.

7

As to causation, Rosenfeld opines that when Turner first visited Hanna, there was no evidence he was in pain or had loose teeth, cavities, or functional limitations. Nor was there any evidence that the problems that Turner developed after Hanna removed his teeth and installed implants resulted from lack of patient compliance. Had Hanna not breached the standard of care, Rosenfeld concludes, the injuries and damages Turner sustained would more likely than not have been avoided.

### Hanna's Objection

Hanna objected to Rosenfeld's report. He argued that the report was conclusory as to the standard of care and breach. Specifically, Hanna contended that Rosenfeld failed to explain what Hanna should have done differently. He also argued that the report was conclusory as to causation in that it lacked the information necessary to explain how any breach caused Turner's alleged injuries or damages.

### Trial Court's First Ruling

The trial court held a hearing, after which it issued a written order overruling Hanna's objection as to the standard of care and its breach. But the trial court sustained Hanna's objection as to Rosenfeld's causation opinion, and it ordered Turner to serve a sufficient expert report regarding causation within 30 days.

### Supplemental Report

Turner served Hanna with a supplemental report made by Rosenfeld. In his supplemental report, Rosenfeld opines that Hanna's breaches caused Turner to

become an "oral invalid," meaning that Turner experienced complete failure of the upper jaw prosthesis and a complete loss of the normal ability to chew. When Turner first came to see Hanna, Turner did not complain of pain, swelling, or lack of function. Turner had no tooth decay or functional deficit at that time. After being in Hanna's care, Turner wears an upper denture plate and has impaired chewing.

More specifically, Rosenfeld opines that Hanna should have foreseen that his failure to comply with the standard of care pertaining to evaluation and imaging would result in the failure to detect existing bone deficiency in Turner's upper jaw and result in a corresponding failure to plan for the lack of sinus floor bone there. Had Hanna undertaken the necessary evaluation and imaging, he could have altered his treatment plan to take this bone deficiency into account. Or, alternatively, Hanna could have advised Turner of the corresponding risks and recommended against the use of implants. These failures caused Turner to become an "oral invalid." And, had Hanna simply done nothing at all, Turner would be better off than he is today.

Rosenfeld further opines that Hanna's violations of the standard of care resulted in Turner having less jawbone than he had before Hanna treated him. Turner's bone loss was increased by infection and the removal of the implants.

In sum, Rosenfeld concludes that Turner's injuries and damages, the latter of which includes the medical expenses required to treat Turner's injuries, would have been avoided altogether if Hanna had not violated the standard of care. In particular,

Rosenfeld states that the perforation of Turner's nasal and sinus cavities by dental screws and the insertion of a screw into his nerve would not have occurred had Hanna used periapical x-rays and three-dimensional imaging. Hanna's failure to do so likewise resulted in Hanna failing to correct these complications during the approximately three-year period in which Hanna continued to treat Turner afterward.

### *Hanna's Renewed Objection*

Hanna objected to Rosenfeld's supplemental report. He argued that Rosenfeld's supplemental causation opinions lack the required degree of specificity and explanation. Hanna maintained that Rosenfeld's opinions remain conclusory by failing to explain how and why Hanna's alleged breaches of the standard of care caused Turner's injuries and damages. Hanna further argued that Rosenfeld did not adequately link his causation opinions to the underlying medical facts of the case.

### *Trial Court's Second Ruling*

The trial court overruled Hanna's renewed objection to Rosenfeld's opinion.

## DISCUSSION

Hanna contends the trial court abused its discretion in ruling that Rosenfeld's initial and supplemental reports together satisfied the Texas Medical Liability Act. Hanna maintains that Rosenfeld's initial report does not adequately identify the applicable standard of care or explain how Hanna breached this standard. Hanna further maintains that Rosenfeld's supplemental report is inadequate as to causation.

10

**Standard of Review**

We review a trial court's ruling regarding the adequacy of an expert report served on a physician or health care provider under the Texas Medical Liability Act for an abuse of discretion. *Baty v. Futrell*, 543 S.W.3d 689, 693 (Tex. 2018). Under this standard, we consider only the information within the four corners of the report. *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (per curiam).

**Applicable Law**

A trial court may grant a motion challenging the adequacy of an expert report "only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the [Act's] definition of an expert report." *Baty*, 543 S.W.3d at 693 (quoting TEX. CIV. PRAC. & REM. CODE § 74.351(*l*)); *see also* TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6) (defining "expert report" as one that gives fair summary of opinions on standard of care, breach, and causation).

To satisfy this standard, an expert report need not marshal all the claimant's proof. *Baty*, 543 S.W.3d at 693. But the report cannot be conclusory. *Id.* It must discuss the standard of care, breach, and causation with enough specificity to inform the physician or health care provider of the conduct that the claimant calls into question and supply a basis for the trial court to find the claim has merit. *Id.*

The standard of care consists of what an ordinarily prudent physician or health care provider would do under the same or similar circumstances. *Am. Transitional*

*Care Ctrs. of Tex. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001). Thus, an expert report must identify a specific act the physician or health care provider was required to perform or refrain from performing, and explain how he or she failed to fulfill his or her duty. *See Baty*, 543 S.W.3d at 694–95 (holding general statement that care should have been provided "in the proper manner" to avoid injury was conclusory and inadequate and advising that adequate report must explain what defendant should have been done differently). If the standard of care or its ostensible breach can only be inferred from the expert report, the report is inadequate. *See Palacios*, 46 S.W.3d at 880 (reasoning that expert report was so vague it might have encompassed multiple unspecified complaints—closer monitoring, securer restraint, or something else—and therefore was too conclusory in nature and inadequate).

With respect to proximate causation, an expert report must identify "how and why" a breach of the standard of care caused the injury, harm, or damages by explaining the basis for the expert's statements and linking his conclusions to specific facts. *E.D. ex rel. B.O. v. Tex. Health Care*, 644 S.W.3d 660, 664 (Tex. 2022) (per curiam). The report need only explain how, as a factual matter, the claimant will prove causation. *Id.* Whether the expert's opinion is credible or believable is not relevant to the question of whether his report is adequate. *Id.*

Talismanic words and phrases are not required. *Baty*, 543 S.W.3d at 693. An expert report does not need to use legal terminology, like "proximate cause,"

"foreseeability," or "cause in fact." *Columbia Valley Healthcare Sys. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017). Regardless of the exact language used, however, the report must explain, factually, how the claimant is going to prove the physician or health care provider proximately caused the injuries, harm, or damages. *Id.*

In evaluating the adequacy of an expert report, we read the report as a whole. *E.D. ex rel. B.O.*, 644 S.W.3d at 667. The report can be informal. *Palacios*, 46 S.W.3d at 879. The information in the report does not have to satisfy evidentiary requirements that will be applicable on summary judgment or at trial. *Id.*; *see also E.D. ex rel. B.O.*, 644 S.W.3d at 667 (reiterating that adequacy is not evidentiary standard and that expert report need not litigate merits as prerequisite to suit).

## Analysis

### *Standard of Care and Breach*

Hanna asserts that Rosenfeld's reports are conclusory as to the standard of care and its breach. Though Rosenfeld criticizes the care Hanna provided, Hanna maintains that Rosenfeld does not explain what Hanna should have done instead.

We disagree with Hanna. Among other things, Rosenfeld opines that Hanna should have used full-mouth periapical x-rays and three-dimensional imaging before removing Turner's teeth and installing implants in his upper and lower jaws. Rosenfeld further opines that Hanna should have used three-dimensional imaging after this procedure, given the signs of complications that Turner soon displayed,

13

which included tingling in the lower lip, liquids running out of his nose when he drank, instability in one of the upper jaw prostheses, and a litany of health issues.

Rosenfeld also explains why the standard of care required Hanna to use full-mouth periapical x-rays and three-dimensional imaging. Apart from identifying whether Turner had enough jawbone to support this procedure at the outset of treatment and thus was a suitable patient for the placement of implants, the use of full-mouth periapical x-rays and three-dimensional imaging afterward would have revealed that dental screws had perforated Turner's nasal passageway and a sinus cavity and struck a nerve. These problems could have then been timely addressed.

In short, Rosenfeld specifically identifies what Hanna should have done differently. This is all that is required with respect to identifying the standard of care and its breach at this point in the case. *See Baty*, 543 S.W.3d at 694–95 (explaining that expert must identify specific act physician or health care provider was required to perform or refrain from performing and explain how he or she failed to do so); *see also Harvey v. Kindred Healthcare Operating*, 578 S.W.3d 638, 652–53 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (holding that expert report adequately stated standard of care and its breach in specifying health care providers should have taken daily x-rays to verify proper placement of chest tube but failed to do so); *Richter v. Downey*, 565 S.W.3d 847, 855 (Tex. App.—Austin 2018, no pet.) (concluding that expert report adequately identified applicable standard of care and

14

its breach by specifying that physician should have ordered CT scan for patient presenting with possible signs of acute appendicitis but failed to order scan).

Rosenfeld opines that Hanna violated the standard of care in a variety of other ways. But having found his opinions concerning full-mouth periapical x-rays and three-dimensional imaging adequate, we need not address other ostensible breaches. *See Miller v. JSC Lake Highlands Operations*, 536 S.W.3d 510, 516 n.7 (Tex. 2017) (per curiam) (stating court need not consider all standards of care articulated in report after concluding others are adequate); *TTHR Ltd. P'ship v. Moreno*, 401 S.W.3d 41, 45 (Tex. 2013) (holding suit could proceed against hospital because expert's report was adequate as to one theory of liability asserting vicarious liability for agents' acts and need not address other agents); *see also* TEX. R. APP. P. 47.1 (requiring opinion to be as brief as practicable while deciding all issues necessary to dispose of appeal).

We hold that the trial court did not abuse its discretion in concluding that Rosenfeld's expert report is adequate as to the standard of care and its breach. Accordingly, we overrule Hanna's issue as to the standard of care and its breach.

### *Proximate Cause*

Hanna asserts that Rosenfeld's reports fail to explain how Hanna's breaches of the standard of care caused Turner's injuries. Hanna likewise says that Rosenfeld does not explain why different care would have resulted in a better outcome.

We again disagree with Hanna. Among other things, Rosenfeld opines that if Hanna had used full-mouth periapical x-rays and three-dimensional imaging before and after the removal of Turner's teeth and placement of implants, dental screws would not have perforated Turner's nasal passageway and sinus cavity or struck a nerve. Or, at the very least, Rosenfeld maintains that Hanna would have discovered these injuries sooner, which would have allowed for their timelier treatment. In other words, Rosenfeld opines that but for the failure to properly x-ray and image Turner before and after the procedure, Turner's injuries either would have been avoided altogether or his suffering would have been of lesser duration or severity.

In this regard, Rosenfeld's causation opinion is akin to the expert report our supreme court found adequate in *Baty*. There, the essence of the expert's opinion was that the standard of care mandated that a nurse anesthetist not puncture the optic nerve with the needle when administering anesthesia, the nurse anesthetist breached this standard by puncturing the optic nerve with the needle, and the nurse anesthetist caused permanent loss of vision in the eye as a result. *Baty*, 543 S.W.3d at 694–98. The supreme court concluded that no more detail than this was required. *See id.*

The same is true here. To satisfy the Texas Medical Liability Act's expert-report requirement with respect to causation, the expert need only explain "how and why" a particular breach of the standard of care caused the injury, harm, or damages and link his explanation to specific facts. *E.D. ex rel. B.O.*, 644 S.W.3d at 664.

16

Rosenfeld opines that Hanna's failure to use full-mouth periapical x-rays and three-dimensional imaging either resulted in the perforation of Turner's nasal and sinus cavities and piercing of his nerve or prolonged and exacerbated Turner's injuries by allowing these particular injuries to go undiagnosed for years. Rosenfeld connects these opinions to specific facts. He relies on imaging showing the placement of the dental screws and records of subsequent care and treatment as evidence of these injuries, and relies on the signs and symptoms Turner reported to Hanna as evidence that these injuries existed immediately after and as a result of the procedure in which Hanna removed all of Turner's teeth and replaced them with dental implants. This is enough to satisfy the Act. *See Owens v. Handyside*, 478 S.W.3d 172, 187–91 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (concluding expert report was adequate as to causation by explaining failure to perform cerebral imaging resulted in delay in diagnosis and care that would have prevented patient's vision loss); *Adeyemi v. Guerrero*, 329 S.W.3d 241, 244–46 (Tex. App.—Dallas 2010, no pet.) (holding expert report was adequate as to causation in explaining that failure to order CT scan or other imaging in face of patient's repeated complaints resulted in delay in diagnosis and care that caused patient's seizure and other brain-related injuries).

To the extent Hanna argues more factual detail or specificity is required, we disagree. Rosenfeld merely has to explain how, as a factual matter, causation will be proved. *E.D. ex rel. B.O.*, 644 S.W.3d at 664. In his supplemental report, he did so.

Likewise, to the extent that Hanna argues Rosenfeld's report is inadequate because he had to account for the fact that dental screws may perforate nasal and sinus cavities or pierce a nerve even when a dentist uses various kinds of imaging, we disagree. At this preliminary stage of the litigation, Turner and his expert are not required to refute potential defenses or litigate the merits. *See id.* at 667 (reiterating that expert report need not litigate merits of claims to be adequate under Act); *Curnel v. Houston Methodist Hosp.-Willowbrook*, 562 S.W.3d 553, 562 (Tex. App.— Houston [1st Dist.] 2018, no pet.) (stating expert does not have to anticipate or rebut defensive theories defendant might assert in response to his causation opinion).

As we have found Rosenfeld's opinions concerning full-mouth periapical x-rays and three-dimensional imaging adequate, including on the issue of proximate causation, we need not address whether his causation opinions concerning other ostensible breaches of the standard of care are also adequate. *See Moreno*, 401 S.W.3d at 45 (holding suit could proceed against hospital because expert's report was adequate as to one theory of liability asserting vicarious liability for agents' acts and need not address other agents); *see also* TEX. R. APP. P. 47.1 (requiring opinion to be as brief as practicable while deciding all issues necessary to dispose of appeal).

We hold that the trial court did not abuse its discretion in concluding that Rosenfeld's supplemental expert report is adequate with respect to causation. Accordingly, we overrule Hanna's issue regarding Rosenfeld's causation opinion.

## CONCLUSION

We affirm.

Gordon Goodman
Justice

Panel consists of Chief Justice Adams and Justices Kelly and Goodman.