# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-22-00177-CV

**Shree Shrestha, M.D. and HMIH Cedar Crest, LLC d/b/a Cedar Crest Hospital & RTC, Appellants**

**v.**

**Claudia Johnson, Individually and as Representative of the Estate of Tony Johnson, Jr., Appellee**

### FROM THE 169TH DISTRICT COURT OF BELL COUNTY, NO. 21DCV327760, THE HONORABLE CARI L. STARRITT-BURNETT, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

The Texas Medical Liability Act requires a health care claimant to furnish a written expert report early in litigation summarizing the applicable standards of care and explaining how the provider's alleged negligence caused the claimant's injury. Appellants Shree Shrestha, M.D., and HMIH Cedar Crest, LLC d/b/a Cedar Crest Hospital & RTC (Cedar Crest), appeal from the denial of their motion to dismiss a health care liability claim brought by appellee Claudia Johnson, individually and as representative of the Estate of Tony Johnson, Jr. Appellants contend that the trial court abused its discretion by overruling their objections to the expert report that Claudia submitted because the report is conclusory as to causation.[1] We affirm.

---

[1] For clarity, we refer to appellee Claudia Johnson by her first name and her deceased son, Tony Johnson, Jr., by his first name.

**BACKGROUND[2]**

Sixteen-year-old Tony was admitted into Cedar Crest on May 29, 2019, for treatment of suicidal ideation. During the intake process, Tony was identified as having a history of depression, and a suicide screen showed him to be at a positive risk level. Tony's body was bruised, and he reported that his father physically abused him, which left him feeling sad and hopeless. Tony attempted suicide three times before he arrived at Cedar Crest. During one attempt he put his father's gun to his head, on another attempt Tony cut his wrists, and Tony also attempted suicide by "drinking fluids." After Cedar Crest evaluated Tony for medication management, he was administered Zoloft, Trazodone, Zydis, and Vistaril.

When Cedar Crest discharged Tony to the care of his family on June 4, 2019 (five days after he was admitted), Dr. Shrestha documented that Tony no longer had suicidal ideations and that his risk level was "very low." Dr. Shrestha did not meet with Tony's family to discuss his discharge. Tony committed suicide by hanging himself on June 5, 2019, the day after he was discharged from Cedar Crest.

Claudia, individually and as the representative of Tony's estate, filed a lawsuit asserting health care liability claims against Dr. Shrestha and Cedar Crest. The petition alleges that Dr. Shrestha's negligence was singularly and/or severally the proximate cause of Tony's death and that Dr. Shrestha's actions and omissions deviated from the appliable standards of care by

---

**2** We derive this summary from Claudia's petition and the expert report. When reviewing the adequacy of an expert report under Chapter 74, we take the allegations in the report as true. *See Marino v. Wilkins*, 393 S.W.3d 318, 320 n.1 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (explaining that because review is limited to four corners of report and curriculum vitae, appellate courts must accept facts therein as true when reviewing an interlocutory appeal under Section 74.351); *see also Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 221 n.1 (Tex. 2018) (per curiam) (noting that "facts recited are in accordance with those alleged in [claimant's] petition and expert reports").

failing to (i) use ordinary care in the administration of health care; (ii) properly examine, diagnose, treat, and monitor Tony; (iii) ensure that Tony received adequate medical care; (iv) properly document medical decision-making; (v) properly evaluate, treat, and assess Tony for discharge; (vi) devise and/or communicate an appropriate discharge plan; and (vii) communicate with a surrogate decision maker. The petition asserts that Cedar Crest is vicariously liable for the alleged negligent acts and omissions of Dr. Shrestha and the medical and nursing staff because they were employed by Cedar Crest and were acting within the scope of their employment at all relevant times.

The petition further alleges that Cedar Crest's negligence was singularly and/or severally the proximate cause of Tony's death and that Cedar Crest's actions and omissions deviated from the applicable standard of care by failing to (i) use ordinary care in the administration of health care to Tony; (ii) train its physicians and staff in providing appropriate health care to Tony; (iii) have and/or enforce appropriate protocols, policies, and/or procedures; (iv) educate, train, and supervise its physicians and staff on appropriate protocols, policies, and/or procedures; (v) educate, train, and supervise its physicians and staff to use ordinary care in the administration of health care to Tony; (vi) educate, train, and supervise its physicians and staff to properly treat, monitor, and intervene; (vii) have and/or enforce adequate policies, procedures, and guidelines specifically regarding appropriate discharge of patients; and (viii) have and/or enforce adequate policies, procedures, and guidelines specifically regarding communication with surrogate decision makers. Finally, the petition contends that the acts of Appellants constituted gross negligence that proximately caused Tony's death and Claudia's damages.

Pursuant to Chapter 74 of the Texas Civil Practice and Remedies Code, Claudia submitted an expert report authored by Dr. Marco Grados, a child psychiatrist and Clinical Director

3

of the Division of Child and Adolescent Psychiatry at Johns Hopkins Hospital.[3] Appellants objected to the report and moved to dismiss the lawsuit, asserting that the report is conclusory as to causation because the report (1) fails to allege how any breach caused injury and (2) fails to link opinions to the facts of the case.

During the hearing before the trial court on the motion to dismiss, Appellants argued that the report failed to explain that any alleged violation of the standard of care was a proximate cause of Tony's completed suicide. Claudia responded that the report links Tony's suicide the day after his discharge from Cedar Crest with Dr. Shrestha's and Cedar Crest's failures to address Tony's depression, properly screen Tony for suicide risk, or develop a safety plan before Tony's discharge. The trial court overruled Appellants' objections and denied the motion to dismiss.

## APPLICABLE LAW

Chapter 74 of the Civil Practice and Remedies Code, also known as the Texas Medical Liability Act (TMLA), requires health care liability claimants to serve upon each defendant, not later than 120 days after that defendant's answer is filed, an expert report that is a good-faith effort to provide a fair summary of the expert's opinion. Tex. Civ. Prac. & Rem. Code § 74.351(a); *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (per curiam). "[T]he purpose of the expert report requirement is to weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims." *Id.* (citing *American Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877 (Tex. 2001)). The report need

---

[3] Marco A. Grados, M.D., MPH, is board-certified by the American Board of Psychiatry and Neurology. Dr. Grados serves as a Professor of Psychiatry and Behavioral Sciences at Johns Hopkins School of Medicine and Clinical Director for the Division of Child and Adolescent Psychiatry at Johns Hopkins Hospital.

not marshal all of the plaintiff's proof but must include the expert's opinion on each of the factors identified in the statute. *Palacios*, 46 S.W.3d at 878. These factors include the "applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." Tex. Civ. Prac. & Rem. Code § 74.351(r)(6). The trial court must dismiss the cause of action against the health-care provider if the plaintiff fails to serve an expert report that satisfies the requirements of the TMLA. *Id.* § 74.351(b).

To constitute a good-faith effort, the report must (1) inform the defendant of the specific conduct that the plaintiff has called into question and (2) provide a basis for the trial court to conclude that the claims have merit. *Palacios*, 46 S.W.3d at 879. A report is not a good-faith effort if it omits any of the statutory requirements or merely states the expert's conclusions about the standard of care, breach, and causation. *Id.* "The 'fair summary' benchmark is not an evidentiary standard, and at this early stage of the litigation, 'we do not require a claimant to present evidence in the report as if it were actually litigating the merits.'" *E.D. ex rel. B.O. v. Texas Health Care, P.L.L.C.*, 644 S.W.3d 660, 667 (Tex. 2022) (per curiam) (quoting *Abshire*, 563 S.W.3d at 226). The ultimate evidentiary value of the expert's opinion, including whether there is a breach and causal connection, "is a matter to be determined at summary judgment and beyond." *Id.* (quoting *Abshire*, 563 S.W.3d at 226); *see Palacios*, 46 S.W.3d at 879 (explaining that "information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial").

"To adequately identify the standard of care, an expert report must 'set forth specific information about what the defendant should have done differently.'" *Abshire*, 563 S.W.3d at 226 (quoting *Palacios*, 46 S.W.3d at 880). While the Act requires only a "fair summary" of the standard

5

of care and how it was breached, "even a fair summary must set out what care was expected, but not given." *Palacios*, 46 S.W.3d at 880.

The expert report must make a good-faith effort to factually explain how proximate cause will be proven. *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017). Proximate cause has two components: (1) foreseeability and (2) cause in fact, though the expert report need not use those terms. *Id.* To establish a causal relationship between the injury and the defendant's negligent act or omission, the report must show that the defendant's conduct was a substantial factor in bringing about the harm and, absent the act or omission, the harm would not have occurred. *Id.* The report must explain to a reasonable degree of medical probability how and why the breach of the standard of care caused the injury. *See Jelinek v. Casas*, 328 S.W.3d 526, 536 (Tex. 2010). An expert may show causation by explaining a chain of events that begins with a defendant's negligence and ends with injury to the plaintiff. *Owens v. Handyside*, 478 S.W.3d 172, 189 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (citing *McKellar v. Cervantes*, 367 S.W.3d 478, 485 (Tex. App.—Texarkana 2012, no pet.)); *Boyles v. Corpus Christi Cardiovascular & Imaging Ctr. Mgmt.*, 622 S.W.3d 420, 426 (Tex. App.—Corpus Christi–Edinburg 2020, no pet.).

The expert "must explain the basis of his statements to link his conclusions to the facts." *Zamarripa*, 526 S.W.3d at 460 (quoting *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)). An expert's statement or opinion is conclusory when (1) he asks the jury to take his word that his opinion is correct but offers no basis for his opinion or the basis he offers does not actually support his opinion; or (2) "he offers only his word that the bases offered to support his opinion actually exist or support his opinion." *Windrum v. Kareh*, 581 S.W.3d 761, 769 (Tex. 2019) (discussing expert testimony) (citing *Jelinek*, 328 S.W.3d at 536).

We review a trial court's denial of a motion to dismiss a health care liability claim for failure to comply with the expert-report requirements for an abuse of discretion. *Baty v. Futrell*, 543 S.W.3d 689, 693 (Tex. 2018). A trial court "abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." *Jelinek*, 328 S.W.3d at 539 (quoting *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985)). "In analyzing a report's sufficiency under this standard, we consider only the information contained within the four corners of the report." *Abshire*, 563 S.W.3d at 223. We view the report in its entirety rather than isolating specific sections to determine if it includes the required information. *Baty*, 543 S.W.3d at 694.

## DISCUSSION

In two issues, Appellants argue that the trial court abused its discretion in denying their motion to dismiss Claudia's health care liability claim for failure to serve an adequate expert report because the report is conclusory as to causation. Appellants summarily assert that "a cursory review of Dr. Grados [sic] expert report reveals that it lacks any explanation of causation" and "Dr. Grados fails to link his causation opinions to the facts of this case." With limited insight into Appellants' specific allegation of error, we first address whether the report adequately describes the causal relationship between Appellants' alleged failure(s) to meet the standards of care and Tony's injury.[4] We conclude that it does.

---

[4] Although Appellants challenge the contents of an eleven-page, single-spaced report, the argument section of Appellants' opening brief and Appellants' reply brief do not include a single citation to the record. *See* Tex. R. App. P. 38.1(i). The Texas Supreme Court has instructed that we should reach the merits of an appeal whenever reasonably possible. *See Weekley Homes, LLC v. Paniagua*, 646 S.W.3d 821, 827 (Tex. 2022). At the same time, we should not make an appellant's argument for him or review the appellate record for facts to support his argument because we would be abandoning our role as a neutral adjudicator and would become an advocate for the appellant. *See Salazar v. Sanders*, 440 S.W.3d 863, 872 (Tex. App.—El Paso 2013, pet. denied).

*The Report is not Conclusory as to Causation*

Dr. Grados's report identifies six areas of alleged breaches in the standard of care and addresses causation for each.[5]

<u>Lack of referral to psychotherapy treatment upon discharge</u>

Dr. Grados first addresses the lack of referral to out-patient psychotherapy treatment as follows:

> In the case of Tony Johnson, the decedent had three prior suicide attempts, including by lethal means by putting a gun to his head. The other two attempts by drinking fluids and cutting his wrists had lower lethality but demonstrate the clinical quality of persistence of intent. In this context, the patient also displayed a clinical condition highly linked to completed suicide, major depressive disorder as defined by the presence of at least 5 criteria of 9 that describe the disorder (DSM 5, 2013).

(Citing American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013)).[6]

Dr. Grados opines that "[d]ue to the prior [suicide] attempts and established endogenous depression, [Tony] was in a high-risk category for recurrence of suicidal behaviors without the assured establishment of the[] two necessary treatments" of anti-depressant medication and psychotherapy. He states that Dr. Shrestha violated the applicable standard of care "because she prescribed an anti-depressant which was to be continued after [Tony's] discharge, but did not make any provision or plan for follow up psychotherapy." Dr. Grados explains that Cedar Crest

---

[5] Appellants do not challenge Dr. Grados's opinions about the applicable standards of care or his qualifications to render an expert opinion.

[6] To form his opinion, Dr. Grados reviewed Cedar Crest records dated May 29 through June 4, 2019, and Tony's autopsy report. Dr. Grados also cites twenty-five authorities and pieces of literature to support his opinions and conclusions within the report.

8

violated the applicable standard of care by discharging Tony "without the appropriate plan for him to receive follow up and ongoing psychotherapy treatment" and that these breaches by Dr. Shrestha and Cedar Crest were the proximate cause of Tony's suicide.

Lack of follow up with antidepressant medication

Dr. Grados notes that Tony received 50 milligrams of Zoloft at discharge, a selective serotonin reuptake-inhibitor (SSRI), which Tony would have recently started given his five-day stay at Cedar Crest.[7] Dr. Grados explains that the use of an SSRI "may be accompanied by new suicidal behaviors" and that the Food and Drug Administration (FDA) "instituted a black box warning on SSRIs in 2004 to reflect the propensity of youth to manifest increased risk of suicidal thinking, feeling, and behavior" after starting an SSRI. For this reason, "initiating an SSRI requires close follow-up visits," and "close monitoring is especially indicated in a patient with recent past suicide attempts." Dr. Grados concludes that Dr. Shrestha violated the applicable standard of care by prescribing an SSRI but not closely monitoring Tony or ensuring that there was a plan for Tony to follow-up after discharge with a physician for close monitoring of the effects of the SSRI, especially in light of his recent suicide attempts. Dr. Grados states that Cedar Crest violated the standard of care by discharging Tony after administering an SSRI with a black box warning without an appropriate plan for Tony to receive follow-up treatment from a physician. Dr. Grados opines that Dr. Shrestha's and Cedar Crest's breaches were the proximate cause of Tony's suicide.

Lack of clinical assessment after a suicide screen

Dr. Grados states that suicide screens are unable to reliably identify true cases from false positives or false negatives. He explains that in other fields of medicine, a positive screen

---

[7]    Dr. Grados states that the usual dose of Zoloft ranges from 50 milligrams to 150 milligrams.

9

test is always followed by a more specific test. Likewise, in psychiatric practice, the follow-up sensitive test to a positive or negative suicide screen is the clinical assessment of risk performed by a trained and licensed clinician. Furthermore, because adolescents with depressive disorders will have fluctuating suicidal ideation, a screen will not easily capture suicidal ideation and a follow-up clinical assessment is necessary after a negative suicidal screen.

Dr. Grados opines that the suicide screen completed by a clinical social worker at Cedar Crest, finding a patient-reported "very low risk" for suicide, is not sufficient information without a clinical risk assessment of suicidal behaviors. Dr. Grados found that Tony's family environment was a post-discharge risk factor of major clinical concern. Tony reported being hit by his father the day before he was hospitalized. Tony also reported that his father had substance abuse concerns and that his mother and sister had issues with alcohol use.[8]

Dr. Grados asserts that Dr. Shrestha violated the applicable standard of care because she did not properly, thoroughly, and accurately assess Tony for the risk of suicidality by following his suicide screen with a clinical assessment. Dr. Shrestha also violated the applicable standard of care because she did not discuss safety measures with Tony's family or ensure there was a plan for a safe home environment before Tony was discharged. Dr. Grados concludes that Cedar Crest failed to ensure that Tony was appropriately assessed for suicide risk and failed to mandate a pre-discharge family meeting. Dr. Grados also concludes that Cedar Crest violated the standard of care because it failed to ensure that its staff had proper tools to gather, interpret, and utilize data.

---

[8] Although the item "reviewed risk factors/crisis that precipitated admission with patient" was "checked" on Tony's discharge paperwork, Dr. Grados states that the discharge paperwork had no notation about any specific discussion for Tony's safety once he returned home to an environment that Tony described as producing "hopelessness due to ongoing abuse."

Dr. Grados opines that Cedar Crest's and Dr. Shrestha's violations of the standards of care were the proximate cause of Tony's suicide.

Lack of safety planning

Dr. Grados explains that "[p]hysical abuse in adolescents is an established risk factor for suicide attempts" and "completed suicide." He notes that a history of abuse "places an adolescent at a high level of risk for completed suicide" and syndromic post-traumatic stress disorder (PTSD), and that "a review of the literature on PTSD and suicide risk in adolescents clearly supports a highly significant association between suicidality and PTSD." Dr. Grados asserts that Tony's history of abuse required clinical inquiry into the diagnosis of PTSD, and that a diagnosis of PTSD would have provided a higher risk of suicidality and called for increased interventions.[9]

Dr. Grados states that despite these facts, Cedar Creek did not provide Tony with follow-up appointments with a mental health provider. Cedar Creek also did not mandate pre-discharge family meetings to address the main trigger for Tony's suicidal ideation—hopelessness regarding abuse by his father. Dr. Grados further notes that although "[t]he most common means worldwide for completed suicide among adolescents is by self-hanging," which Tony used to take his life, Cedar Crest's discharge checklist did not ask about this method and asked only about firearms and sharp objects. Dr. Grados states that Cedar Crest further violated the standard of care because the discharge checklist did not include an individualized safety plan for how Tony should address his environment and triggers, such as his father and his unsafe home environment.

---

[9] Dr. Grados notes that an "indication of the need to 'r/o PTSD' is made in the diagnostic list from the discharge care plan.'"

11

Dr. Grados concludes that Dr. Shrestha violated the standard of care by failing to identify, or identifying but failing to address, that Tony's father was one of the primary underlying triggers for Tony's suicide attempts and suicide success. Dr. Grados opines that Cedar Creek's failure hold a family meeting, have an adequate discharge checklist, or provide Tony with follow-up appointments with mental health providers, and Dr. Shrestha's failure to identify, address, or form a safety plan for the underlying triggers for Tony's suicidal urges were proximate causes of Tony's completed suicide.

Failure to initiate clinical intervention for family related risk factors

Dr. Grados asserts that "paternal attachment has been found to be a predictor of suicide attempts compared to hospitalized adolescents with depression who are not attempters." Dr. Grados notes that Tony's clinical risk factors for completed suicide post-discharge include a prior attempt where Tony pulled the trigger on himself with his father's gun and low family cohesion with parental physical abuse reported to the Texas Department of Family and Protective Services. The medical report that Dr. Grados reviewed documents physical abuse (i.e., "physical fight with dad. Instigated by dad," "First time 3-4 months ago, 2nd [time] today," "Assaulted by dad"). The nursing assessment and physical exam also document physical abuse (noting "bruising to the back of neck and R side face" and "L shoulder pain"). Tony's sister also told staff that their "father can be emotionally abusive." Dr. Grados found that "these signs constitute clinical red flags which merit specific clinical intervention," a family meeting upon admission and discharge, and a referral to appropriate clinical practice.

Dr. Grados concludes that Dr. Shrestha violated the standard of care by failing to recognize clinical red flags such as the lethality of Tony's prior suicide attempts, initiate clinical intervention and pre-discharge family meetings in response, and provide referrals for clinical

12

follow-ups to ensure Tony's safety post-discharge. Dr. Grados also contends that Cedar Crest failed to ensure that Tony was provided high-level clinical treatment and a pre-discharge family meeting. Dr. Grados asserts that the violations of the standards of care by Cedar Crest and Dr. Shrestha were a proximate cause of the completed suicide of Tony.

<u>Lack of communication and established follow-ups</u>

Dr. Grados states that data from a recent large cohort study confirms that "access to care within a short period of time after a hospital discharge is associated with a decreased risk of completed suicide," while shorter hospital stays are a "risk factor for completed suicide." Because of the shortage of specialist providers for youth mental health care, Dr. Grados explains that it is critical to secure outpatient services for youth who are acutely hospitalized for life-threatening conditions such as endogenous depression and suicidal ideation.

Dr. Grados found that "there was no follow-up mental health visit scheduled post-hospital discharge" for Tony.[10] Importantly, the psychosocial assessment recorded Tony stating that "he does not feel safe at home and has begun to feel worthless and that his only way out is to kill himself." Because Tony did not have any prior established care, he was a high-risk patient, and both parents had alcohol and/or drug use issues, Dr. Grados concludes that it was a clinical requirement to establish a safe home environment pre-discharge and initiate establishment of follow-up care.

Dr. Grados asserts that Dr. Shrestha violated the standard of care by failing to recognize Tony as a high-risk patient and secure outpatient therapy or follow-up visits for Tony. She also failed to hold a family meeting to discuss available professional resources pre-discharge.

---

[10] Dr. Grados notes that the discharge planner documented that Tony had an appointment with a primary care doctor, who was not a mental health provider, on June 9, 2019.

Dr. Grados concludes that Cedar Crest violated the standard of care by failing to ensure that Tony received appropriate clinical care that included a pre-discharge family meeting and scheduling of follow-up visits and outpatient therapy. Dr. Grados opines that Dr. Shrestha's and Cedar Crest's failures were the proximate cause of Tony's completed suicide.

The totality of the breaches of standard of care

Dr. Grados summarizes that Tony was a "high-risk patient who required clinical intervention" because he "had three suicide attempts, one of which was by lethal means," and "it was thoroughly noted that [Tony] suffered from physical abuse from his father." A suicide screen administered when Tony was admitted to Cedar Crest reported a positive risk level of thirty-six. Tony was hospitalized for only five days, and he exhibited "major depressive disorder." Upon discharge, Tony was "initiated on an SSRI that had an FDA-issued black box warning for the manifestation of suicidal ideations in young people." Dr. Grados concludes that "[i]t is foreseeable that the initiation of an SSRI in a patient who had recent past suicide[e] attempts, without close monitoring or established psychotherapy treatments, would result in that patient being at a higher risk of manifesting increased risk of suicidal thinking, feeling, and behavior," as happened with Tony.

Dr. Grados further notes that Dr. Shrestha failed to conduct a clinical assessment to ensure the accuracy of the suicide screen administered by a social worker on Tony's discharge date, despite this being the "prevalent standard of care for facilities like Cedar Crest." Without a clinical assessment, Dr. Grados opines that it is foreseeable that Tony would be discharged on the basis of an unreliable negative suicide screen. In addition, Cedar Crest and Dr. Shrestha discharged Tony as a high-risk patient without a discharge plan and without conducting a family meeting to address his unsafe home environment and suicidal triggers, including physical abuse by his father

14

and alcohol and substance use by his parents. Cedar Crest failed to use a discharge checklist that included "self-hanging, one of the most prevalent forms of suicide among adolescents."

Dr. Grados found that the combination of violations of standards of care "likely caused Tony . . . to feel like he was being discharged back into an unsafe environment and that he had no way out but to complete suicide." Furthermore, Dr. Grados concludes that "[i]t was foreseeable that discharging [Tony] back out into such an environment would result in completed suicide." "It is therefore [Dr. Grados's] professional opinion, within a reasonable degree of medical probability, that the totality of these violations caused [Tony] to complete suicide the day after he was discharged from Cedar Crest []."

We disagree with Appellants' argument that Dr. Grados's opinions are conclusory as to causation. Dr. Grados provides the bases for his opinions, including his review of the relevant records with specific references to acts or omissions documented in them, and explanations for how the facts support his opinion. Dr. Grados links his conclusions to the alleged breach of the standard of care by Dr. Shrestha and Cedar Crest, and his chain of events articulates causation. *See Owens*, 478 S.W.3d at 189. Considering the report as a whole, Dr. Grados attributes the breach to Dr. Shrestha for allegedly failing to ensure that Tony underwent a proper clinical assessment for suicidality before he was discharged because Tony was a high-risk patient that attempted suicide three times, he was bruised and reported that his father abused him, he displayed major depressive disorder and reported feeling hopeless, and he had no established prior care. Dr. Grados contends that Cedar Crest failed to initiate a clinical assessment after performing a suicide screen on Tony, which was particularly necessary because Tony was hospitalized for a short time. The report attributes additional breach to Cedar Crest and Dr. Shrestha for discharging Tony without arranging to monitor the effects of the SSRI they administered, which has a propensity to manifest suicidal

15

ideations in adolescents. And the report asserts that Cedar Crest failed to use a discharge checklist that included self-hanging, one of the most prevalent methods of suicide among adolescents and the method that Tony used. These statements explain "how and why" Appellants' alleged breach proximately caused injury to Tony, a high-risk, depressed adolescent who was newly placed on an SSRI and discharged into an environment where he had been abused, triggered, and felt unsafe. Because Dr. Grados's report explains "how and why" Appellants' alleged breach led to the injury, the report adequately "links his conclusions with the underlying facts." *Abshire*, 563 S.W.3d at 226.

Dr. Grados's report is similar to reports that courts have concluded provided sufficient information about causation and represented a good-faith effort and fair summary. *See E.D. ex rel B.O.*, 644 S.W.3d at 662, 664. The report that the Texas Supreme Court concluded was sufficient in *Abshire* linked nurses' alleged breach of the standard of care over several hospital visits and Abshire's spinal injury. 563 S.W.3d at 221–25. That report explained that the "[f]ailure of the nursing staff to document a complete and accurate assessment resulted in a delay in proper medical care (ie. [sic] the ordering of imaging studies and protection of the spine.)." *Id.* at 224 (alteration in original). The report concluded that if hospital staff "had a complete medical history they would have known to examine other areas and that this patient had a high probability of a compression fracture." *Id.* at 225. According to the expert report, this "lack of proper documentation in the patient's medical record lead [sic] to a delay" in Abshire's treatment, "which in medical probability" led to Abshire's paralysis. *Id.* The Texas Supreme Court concluded that the report satisfied the causation requirement because it drew a line from the nurses' failure to properly document Abshire's pain, to a delay in diagnosis and proper treatment, to injury. *Id.*

16

Guided by *Abshire*, we conclude that the trial court was within its discretion to decide that Dr. Grados's report provides sufficient information about causation and so represents a good-faith effort at a fair summary. *See* Tex. Civ. Prac. & Rem. Code § 74.351(l), (r)(6); *Abshire*, 563 S.W.3d at 223–25. Much like the report in *Abshire*, Dr. Grados's causation opinions are not conclusory or speculative. His report explains his background and experience, the medical records and materials that he reviewed, and the facts that support "how and why" Dr. Shrestha's and Cedar Creek's alleged breaches led to Tony's suicide. *See Abshire*, 563 S.W.3d at 223–25*; see also Windrum*, 581 S.W.3d 769; *E.D. ex rel B.O.*, 644 S.W.3d at 666–67 (explaining that court's disagreement with expert's opinion at this stage does not render the expert report conclusory). An expert report adequate "even if as to one theory only, entitles the claimant to proceed with a suit against the physician or health care provider." *Richter v. Downey*, 565 S.W.3d 847, 855 (Tex. App.—Austin 2018, no pet.) (quoting *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013)). We thus overrule Appellants' first issue.

*The Report is not "equivalent to no report"*

Appellants argue in their second issue that Dr. Grados's report is "equivalent to no report" being served by Claudia because the report is conclusory as to causation. Because we concluded in the first issue that the trial court was within its discretion to overrule Appellants' objections to the expert report, we overrule Appellants' second issue. *See* Tex. R. App. P. 47.1.

## CONCLUSION

We affirm the trial court's order.

17

_____

                     Edward Smith, Justice

Before Chief Justice Byrne, Justices Triana and Smith

Affirmed

Filed:   April 30, 2024